IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS EDWARD CARTER,

    *Petitioner*,

    v.                                 Criminal Action No. ELH-00-0100

UNITED STATES OF AMERICA,

    *Respondent*.

**MEMORANDUM OPINION**

This Memorandum Opinion resolves a Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)(i), submitted by defendant Thomas Edward Carter, who is self-represented. ECF 438. He was convicted of conspiracy to distribute narcotics and related offenses in June 2001. Judge Andre Davis, to whom the case was then assigned, sentenced Carter to life imprisonment plus 30 years.[1]

The motion is supported by four exhibits. ECF 438-1 to 438-4. In addition, Carter has filed a supplement to the motion. ECF 494. I shall refer to the submissions collectively as the "Motion." The government opposes the Motion. ECF 501. Carter has replied. ECF 502.

Carter has also filed three motions to appoint counsel to assist with his Motion. ECF 451; ECF 459; ECF 477. I denied the first two motions (ECF 451 and ECF 459) because I found that there was no basis for appointment of counsel under the Criminal Justice Act. ECF 461. Similarly, as to the most recent motion (ECF 477), there is no basis for appointment of counsel.

Notably, through appointed counsel, Carter previously moved for a reduced sentence under

---

[1] Judge Davis was elevated to the Fourth Circuit in 2010. As a result, the case was reassigned to Judge J. Frederick Motz. It was reassigned to me on August 7, 2018, due to the retirement of Judge Motz.

Section 404 of the First Step Act of 2018.  ECF 381.  In April 2020, I granted that motion, in part, and reduced defendant's sentence to 35 years of imprisonment.  *See* ECF 430.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant Carter's Motion, in part, and reduce his total sentence to 33 years of imprisonment (396 months).

## I.    Factual and Procedural Background[2]

Carter and several others were charged with drug and firearms offenses in an Indictment filed on March 7, 2000.  ECF 1.[3]   A Superseding Indictment followed on August 8, 2000.  ECF 30.   And, a Second Superseding Indictment was filed on February 6, 2001, charging Carter and four others with various offenses.  ECF 88.

In particular, Carter was charged in four of eleven counts, as follows: conspiracy to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. § 846 and § 841(b)(1)(A) (Count One); and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts Six, Seven, and Eight).

Carter, along with codefendants Bobby Brown and Julius Brown, proceeded to a jury trial that began  on April 30, 2001, before Judge Andre Davis.   *See* Docket.   The jury returned its verdict on June 5, 2001.   ECF 143.   Of relevance here, Carter was convicted of Counts One, Seven, and Eight, and he was found not guilty as to Count Six.[4]   In addition, the jury made findings

---

[2] Where appropriate, I have drawn on and incorporate the factual background set forth in my Memorandum Opinion of April 17, 2020.  *See* ECF 424.

[3] As a review of CM/ECF indicates, electronic availability of court filings did not begin until June 2008, with ECF 267.    However, the Court previously reviewed the Chambers files retained by the two judges who had handled Carter's case.

[4] Codefendants Julius Brown and Bobby Brown were also convicted of several counts.

as to the drug quantities attributable to Carter.   It determined that Count One involved 100 grams or more of heroin, 50 grams or more of cocaine base, and no powder cocaine.   *Id.*

Judge Davis conducted Carter's sentencing on August 16, 2001.   *See* Docket; *see also* ECF 400-1 (Transcript).   According to the Presentence Report ("PSR," ECF 420), defendant was born in May 1972, and was 29 years of age.   *Id.* at 1.[5]

Count One, by statute, required a mandatory minimum term of ten years' imprisonment, with a maximum of life imprisonment.   ECF 420, ¶ 41.   The U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") called for life imprisonment.   *Id.* ¶ 44.[6]   By statute, Count Seven required a mandatory, consecutive sentence of five years of imprisonment, and Count Eight required a mandatory, consecutive term of 25 years of incarceration.   *Id.* ¶¶ 42, 43.

According to the PSR (ECF 420), Carter had a base offense level of 38 for Count One, the drug conspiracy count, pursuant to U.S.S.G. § 2D1.1(c)(1).   *Id.* ¶ 14.   However, in determining Carter's Guidelines range for Count One, the PSR did not rely on drug quantity.   Instead, the PSR applied the murder cross-reference provision, based on defendant's involvement in the first-degree murder of Douglas Pennix in 1999.   *Id.* ¶ 18.[7]   In particular, U.S.S.G. § 2D1.1(d)(1) states: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, had such killing taken place within the territorial or maritime jurisdiction of the United States,

---

[5] Defendant asserts that he was 23 years of age at the time of the offense (ECF 408 at 3, 4), and 27 years old at the time of sentencing.   *See* ECF 438 at 2.   The discrepancy is immaterial.

[6] At the time, the Guidelines were mandatory, not advisory.   *See United States v. Booker*, 543 U.S. 221 (2005).

[7] Apparently, Mr. Pennix was shot from behind by codefendant Bobby Brown.   ECF 397 at 34; ECF 400-1 at 9.

apply § 2A1.1." Therefore, Judge Davis determined that Carter had a base offense level of 43, pursuant to U.S.S.G. § 2D1.1(d)(1) and § 2A1.1.

Carter also received a four-level enhancement under U.S.S.G. § 3B1.1(a) for his role as an organizer or leader in the offense, which involved five or more participants.   ECF 420, ¶ 18. Given that Carter went to trial, he did not earn deductions for acceptance of responsibility.  Thus, Carter had a final offense level of 47 for Count One.  ECF 420, ¶ 24; *see also* ECF 400-1 at 18. And, as noted, by statute Counts Seven and Eight required mandatory, consecutive sentences of five years and 25 years, respectively, totaling 30 years.   ECF 420, ¶ ¶ 24-25, 42-43.

According to the Presentence Report, Carter had a Criminal History Category of III.  ECF 420, ¶ 35.  However, Judge Davis determined that he had a Criminal History Category of I.  ECF 400-1 at 6.

The issue of the murder cross-reference was addressed at sentencing.   After careful consideration, Judge Davis applied the murder cross-reference to Carter.    ECF 400-1 at 9-10. The Court concluded that Carter and his codefendant, Bobby Brown, were "involved in a cold-blooded murder," *id.* at 9, and that "Bobby Brown was the shooter in the Pennix murder.    And Mr. Carter participated in that conspiracy." *Id.* at 10.

As then required, Judge Davis imposed a term of life imprisonment as to Count One, a mandatory term of five years, consecutive, as to Count Seven, and a mandatory term of 25 years, consecutive, as to Count Eight.    *See* ECF 400 at 22-23.    This resulted in a total sentence of life imprisonment plus 30 years.    ECF 172 (Judgment).    The Court also imposed a period of supervised release of 25 years.   *Id.*

Carter's conviction and sentence were affirmed on direct appeal.    ECF 215; *United States*

*v. Brown, et al.*, 70 Fed. App'x 99, 104 (4th Cir. 2003) (per curiam).   Carter did not file a petition for certiorari to the Supreme Court.   ECF 381 at 2, ¶ 15.

On August 11, 2005, Carter filed a motion to vacate under 28 U.S.C. § 2255.   ECF 227. The government responded.   ECF 241.   By Memorandum Opinion and Order of June 26, 2006, Judge Davis denied the motion to vacate.   ECF 243; ECF 244.

Carter subsequently moved for a sentence reduction on September 15, 2008.   ECF 279. On September 18, 2008, the Court appointed the Federal Public Defender ("FPD") to review Carter's eligibility for a sentence reduction based on Amendment 706 to the Guidelines, relating to cocaine base ("crack") offenses.   ECF 280.   The FPD subsequently concluded that Carter was ineligible for a sentence reduction.   ECF 283.   And, in orders of February 3, 2009 (ECF 284) and February 5, 2009 (ECF 286), Judge Davis denied the sentence reduction motion.    Carter's appeal (ECF 301) was dismissed by the Fourth Circuit.    ECF 305; ECF 306.

Carter filed another motion on June 2, 2014, challenging the application of the murder cross-reference.    ECF 342.    Judge Motz denied that motion by Memorandum and Order of August 12, 2014.   ECF 347; ECF 348.

On April 24, 2019, Carter filed a motion for appointment of counsel.   ECF 377.   I granted that motion.   ECF 378.   A motion for a reduced sentence under Section 404 of the First Step Act followed on November 8, 2019.    ECF 381.   By Memorandum Opinion (ECF 424) and Third Amended Judgment (ECF 430), I granted the motion, in part.   Of relevance here, Carter sought a sentence reduction "to 324 months (or less)," ECF 381 at 3, ¶ 17, ECF 408 at 5, or to "time served" or "262 months imprisonment."   ECF 381 at 10, ¶ 31.[8] Although the government agreed that Carter

---

[8] Carter also requested, alternatively, a sentence of "92 months."   ECF 381 at 10, ¶ 3.

was eligible for a reduction of sentence under Section 404, it sought a reduction to a total of 60 years.  ECF 389 at 3.

In reaching my determination, I concluded that, if Carter were prosecuted today, he would face a maximum term of forty years for Count One, rather than life imprisonment.  ECF 424 at 12. I also recognized that, under the First Step Act's reforms to the "stacking" scheme in 18 U.S.C. § 924(c), discussed *infra*, if Carter were sentenced today he would face a maximum term of 10 years' imprisonment for Counts Seven and Eight, rather than the 30 years he received.  *Id.* at 14.  And, I observed that these reforms are not retroactive and therefore did not compel a sentence reduction for Counts Seven and Eight.  *Id.* at 13.  Nevertheless, I expressly and clearly indicated that, in granting the substantial sentence reduction for Count One, I took into account the change in the law as to Counts Seven and Eight.  *Id.* at 17.  In other words, I considered that, if defendant were sentenced today, he would not face a 30-year, consecutive sentence on those two counts.

As I saw it, a total sentence of 35 years was appropriate.  To achieve that result, I reduced the sentence for Count One from life imprisonment to five years, making it unnecessary to disturb the sentences for Counts Seven and Eight.  *See id.* at 18.  When the revised sentence for Count One (five years) was combined with the sentence of thirty years for Counts Seven and Eight, the defendant's total sentence was reduced to 35 years of imprisonment.  *Id.* at 17-18.

The Court views the prior ruling as one that was quite lenient to the defendant. Nevertheless, on August 19, 2020, about four months after my decision, Carter filed the Motion. ECF 438.  He seeks a sentence of time served, citing six reasons for extraordinary and compelling

---

The Court assumed that the reference to 92 months was a mistake, given that Carter had already served far longer than 92 months.  *See* ECF 430 at 1 n.2.

grounds under § 3582: the changes to the § 924(c) "stacking" scheme; the COVID-19 pandemic; the "trial penalty" he asserts he received for rejecting a plea bargain; his young age at the relevant time; his record of rehabilitation while incarcerated; and the need to care for his mother, who is ill. *Id*. at 20-31.   He suggests that a "term of supervised release" would be an adequate substitute. *Id*. at 30-31.

The government does not contest that Carter has satisfied the administrative requirements for the Motion. ECF 501 at 17.  But, it opposes the Motion, arguing that Carter lacks any "extraordinary and compelling reason" for release and that, in any case, the sentencing factors under 18 U.S.C. § 3553(a) do not support a reduction. ECF 501 at 17-31.

Carter has a projected release date of May 26, 2030.   *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Nov. 10, 2022).

## II.  Statutory Framework

### A.  Compassionate Release

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022).  This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See, e.g., Orlansky v. FCI Miami Warden*, 754 F. App'x

862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are

applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison,
> pursuant to a sentence imposed under section 3559(c), for the offense or offenses
> for which the defendant is currently imprisoned, and a determination has been made
> by the Director of the Bureau of Prisons that the defendant is not a danger to the
> safety of any other person or the community, as provided under section 3142(g);
> and that such a reduction is consistent with applicable policy statements issued by
> the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S.

___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d

181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the court

must find that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2)

the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing

Commission; and (3) on balance, the factors set forth in 18 U.S.C. § 3553(a) warrant a reduction

of sentence.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A)

analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to

reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only

if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"

*United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C.

§ 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C.

§ 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[9]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D).  Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[9] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply here.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, No. 21-6776, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, No. 21-6781, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what

should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required'" from the court. *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments. *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release. Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194. And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

Nevertheless, the defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As indicated, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises,"

13

or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### B. "Stacking" Under 18 U.S.C. § 924(c)

As noted, as to Counts Seven and Eight, the two firearm offenses under 18 U.S.C. § 924(c), Carter was sentenced to a mandatory consecutive term totaling 30 years (360 months). At the time of Carter's sentencing, a defendant could be sentenced for multiple § 924(c) charges at the same time, even if the convictions were not yet final, resulting in one five-year sentence and a mandatory minimum penalty of 25 years, consecutive, for each subsequent § 924(c) offense. *See United States v. Jordan*, 952 F.3d 160, 165 (4th Cir. 2020). With respect to Carter's two convictions under 18 U.S.C. § 924(c) (Counts Seven and Eight), Judge Davis was required to impose five and 25-year sentences, respectively.

Section 403(a) of the 2018 FSA amended the language of 18 U.S.C. § 924(c)(1)(C) by striking a "second or subsequent conviction under this subsection" and inserting "violation of this subsection that occurs after a prior conviction under this subsection has become final." Therefore, the amendment has effectively eliminated the procedure of "stacking" multiple § 924(c) convictions for the purpose of enhancing the penalties associated with a "second or subsequent" § 924(c) conviction within the same indictment. *Id*. As amended, the enhanced mandatory minimum applies only if the prior qualifying § 924(c) conviction became final before the new violation occurred.

In other words, the 2018 FSA amended § 924(c) so that it "no longer applies to multiple § 924(c) convictions obtained in a single prosecution." *Jordan*, 952 F.3d at 171.  But, this provision is not retroactive.  *See* 2018 FSA, Section 403(a), (b); *see also Jordan*, 952 F.3d at 172.

As mentioned, if sentencing were held today, Carter would face a maximum of forty years for Count One.  *See* ECF 414 (Memorandum Opinion as to codefendant Bobby Brown) at 13.  In particular, under the First Step Act, Count One now carries a mandatory minimum term of five years, rather than ten years, and a maximum term of forty years, rather than life imprisonment.  *Id.* For Counts Seven and Eight, defendant would face a maximum of ten years.  Thus, Carter's total sentence could not exceed 50 years.  *See id*.  at 13-14.  As stated, when I resolved Carter's earlier motion, I took into account the change in the law as to Counts Seven and Eight and addressed it by reducing defendant's sentence for Count One to five years of imprisonment.

### III.    COVID-19[10]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[11]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

---

[10] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid.  201.

[11] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of November 15, 2022, COVID-19 has infected more than 98 million Americans.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed November 15, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  Businesses and schools were shuttered or operated on a limited basis for quite some time, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (Apr. 2, 2020),

https://bit.ly/2XoiDDh.   The judiciary, too, faced many operational challenges.   Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."   *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.   The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.   *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.   But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.   In October 2022, the CDC updated its guidance to reflect the most available data.   *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (October 19, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid

organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive."  *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category."  *Id.* at 196.  Nevertheless, the Court may consider the CDC's identification of risk factors.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing.  They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to

isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others.  *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing).  They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health,

School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[12]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate

---

[12] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer,

21

Moderna, Johnson & Johnson, and Novavax). *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.  As of October 2022, approximately 68% of the total U.S. population is fully vaccinated, including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 93% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated October 20, 2022).

Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated October 4, 2022).  And, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older. *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020.  Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As of November 15, 2022, the BOP had 144,900 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 337,368 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed November 15, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept. 1. Almost as encouraging as the

magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

24

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping.  Other countries are breaking records*., WASH. POST (Feb. 7, 2022),          https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   Again, the country began to return to normalcy.

Unfortunately, that respite did not last long.  In the spring of 2022, we experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again.  How Cautious Should We Be?*,          N.Y.          TIMES          (Apr.          7,          2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.   In particular, in the spring of 2022, a new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.

It appears that the coronavirus is now a fact of life.  And, in an interview on "60 Minutes", in September 2022, President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He

stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it. . . . But the pandemic is over." *Id.*

As of November 15, 2022, the BOP reported that 202 federal inmates, out of a total population of 144,900, and 304 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 48,102 inmates and 14,441 staff have recovered from the COVID-19 virus.  In addition, 309 inmates and seven staff members have died from the virus.  The BOP has completed 128,663 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Bennettsville, where defendant is incarcerated, the BOP reported that as of November 15, 2022, out of a total of 1,664 inmates, zero inmates and zero staff members have tested positive.  Two inmates in FCI Bennettsville have died of COVID-19, and 147 inmates and 132 staff members have recovered at the facility.  In addition, 167 staff members and 1,271 inmates at FCI Bennettsville have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, FCI Bennettsville (bop.gov) (last visited November 15, 2022).

### IV.    Discussion

Carter seeks a sentence of time served under § 3582(c)(1)(A)(i).    As noted, he cites six major factors that, in his view, justify a finding of extraordinary and compelling reasons to reduce his sentence.    These include the reforms to § 924(c) and its "stacking" scheme; the COVID-19 pandemic; the "trial penalty" he asserts he received for rejecting a plea bargain; his young age at the relevant time; his record of rehabilitation while incarcerated; and the need to act as his mother's caregiver.    ECF 438 at 20-31.

The stacking issue has already been described, *supra*.  To summarize, under 18 U.S.C. §

924(c), Carter was sentenced to a mandatory consecutive term of 30 years for Counts Seven and Eight, the two firearms offenses, because Count Eight was considered a second conviction requiring a 25-year sentence.   The First Step Act amended § 924(c) so that it no longer applies to multiple § 924(c) convictions obtained in a single prosecution, but did not make this change retroactive.   If sentencing were held today, Carter would face a total of 10 years' imprisonment for Counts Seven and Eight, rather than 30 years.   He argues that this substantial change in sentencing law justifies a sentence reduction.   ECF 438 at 21-24; ECF 494 at 4-11.

The Fourth Circuit's decision in *McCoy*, 981 F.3d 271, is instructive.   In *McCoy*, the Fourth Circuit affirmed several district court rulings reducing stacked § 924(c) sentences under the compassionate release provision.   *Id.* at 274-80.   The Court held that the district courts had properly taken into account, in applying the "extraordinary and compelling reasons" standard, both the "sheer and unusual length of the sentences" and the "'gross disparity' between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id.* at 284-86 (internal citations omitted).

"The fact that Congress chose not to make [another section] of the First Step Act categorically retroactive," the Court remarked, "does not mean that courts may not consider that legislative change in conducting their individualized reviews of motions for compassionate release under § 3582(c)(1)(A)(i)." *Id.* at 286.   The Court also emphasized that the district court decisions reducing the defendants' sentences were the "product of individualized assessments," taking into account the defendants' relative youth at the time of their offenses (between 19 and 24 years), the substantial sentences already served (between 17 and 25 years), and their excellent institutional and rehabilitative records.   *Id.*

In my view, the statutory change for the offenses in Counts Seven and Eight satisfies the "extraordinary and compelling" prong of the § 3582 analysis.   And, I am entitled to consider the legislative change in conducting the individualized review of the Motion under § 3582(c)(1)(A)(i). *McCoy*, 981 F.3d at 286.

Notably, as part of the § 3553(a) analysis, other judges in this District have considered a change in the penalties that a defendant would face if prosecuted today.   *See, e.g.*, *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), *aff'd*, *McCoy*, 981 F.3d 271; *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, 2020 WL 789068, at *2 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, 2020 WL 758525, at *2 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, 2020 WL 586811, at *4 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).   As Judge Bennett explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'" *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020).

Nevertheless, I must reiterate and emphasize that I have already considered the change in the law as to 18 U.S.C. § 924(c).   I was mindful of this change in the law when I considered defendant's prior motion under Section 404 of the First Step Act (ECF 381).   Because the First Step Act's changes to § 924(c) were not retroactive, I compensated defendant by substantially reducing his sentence for Count One, from life imprisonment (or the current maximum of forty

years) to five years.  Therefore, I decline to grant the Motion on the basis of the change in the law as to § 924(c), because I have already done so.

The Court next considers whether, if Carter were released, he would pose a danger to the community.  In this regard, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).   These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government maintains that the § 3553(a) factors support a denial of Carter's Motion. In particular, the government emphasizes the seriousness of Carter's offenses, including the use of violence, most notably his participation in the conspiracy to murder Douglas Pennix.   ECF 501 at 1, 22.  The government also cites Carter's criminal history, as well as his prior arrests and previous probation violations.  *Id*. at 22.

For his part, Carter argues that he is a changed man who committed his offenses at a young age and has pursued extensive rehabilitation during his lengthy prison sentence.    ECF 438 at 3-4; ECF 494 at 5.   He asserts that he "has learned his lesson, and any additional prison time will not serve the goals of sentencing, provide deterrence, nor protection for the public . . . [He] is not a danger to anyone." ECF 494 at 5.

Again, many of these factors were discussed in my previous ruling, which I incorporate here.  *See* ECF 424 at 16-17.  When the underlying offenses occurred, Carter was in his twenties, and old enough to know better.  It is difficult to attribute the crime of murder to defendant's age.

29

But, were Carter sentenced today, the maximum sentence for all three counts would be 50 years of imprisonment.  *See* ECF 424 at 13.

I am also mindful of the fact that I previously reduced the sentences of two of Carter's codefendants: Julius Brown and Bobby Brown.   *See Julius Brown v. United States*, ELH-00-100, 2020 WL 7425328 (D. Md. Dec. 17, 2020); *Bobby James Brown v. United States*, ELH-00-100, 2021 WL 5015752 (D. Md. Oct. 28, 2021).

I granted Julius Brown's compassionate release motion, reducing his sentence of life imprisonment plus 30 years to time served (roughly 20 years).  *See* 2020 WL 7425328, at *1, 17. However, his circumstances were quite different from those of this defendant.  For example, he was not charged with the Pennix shooting.  *Id.* at *16.  And, his age (71 years old) and various health conditions were significant, and put him at an increased risk of severe consequences if he were to contract COVID-19.  This anchored my finding of extraordinary and compelling reasons. *Id*. at *13-14.

As to Bobby Brown, I initially reduced his sentence from life imprisonment plus 30 years to 40 years, pursuant to Section 404, and then further reduced the 40-year sentence to 37 years, in consideration of "the changes in the sentencing landscape with respect to § 924(c), the disproportionate length of Brown's sentence, Brown's efforts towards rehabilitation while in custody, his lack of any recent infractions, his age at the time of his offense, and the challenges posed by the pandemic."  *See* 2021 WL 5015752, at *14.  Notably, Bobby Brown is the one who actually shot Douglas Pennix.  *Id.*

As I have tried to explain, I do not approach this case from a blank slate.  After careful consideration of the case, I previously reduced Carter's sentence from life imprisonment plus 30

30

years to a total of 35 years—a substantial reduction.  To be sure, "[t]his is a long sentence in a system without parole." ECF 424 at 17.  But, for a defendant in custody since 2000, beginning when he was in his twenties, the difference between a sentence of life imprisonment plus 30 years and a sentence of 35 years is life altering.

The Court is mindful that Carter was not the one who actually shot Douglas Pennix.  And, as stated previously, "[b]ecause [Bobby] Brown was the one who actually shot Pennix, and Carter's Criminal History category was more favorable than Brown's, it is appropriate, in my view, for Carter to receive a revised sentence below the one Brown received." ECF 424 at 17.  And, Carter's reduced sentence of 35 years appears longer than at least some federal sentences recently imposed for drug offenses involving murder.  *See, e.g., United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at \*5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf), *aff'd*, *McCoy*, 981 F.3d 271.

For example, in *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted after a 25-day trial.  *See id.*, ECF 477; ECF 491.   In particular, Floyd was convicted of racketeering conspiracy that included murders and drug conspiracy.   However, he was not the shooter.   Although his offense level and criminal history category called for a life sentence, Judge Blake imposed a total sentence of 360 months' imprisonment.   *Id.*, ECF 691.

More recently, in *United States v. Antoine*, PWG-19-140, the defendant was involved in a drug trafficking organization in Baltimore and confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy.   *See id.*, ECF 349 at 9-10.   Pursuant to a plea agreement, Antoine entered a plea of guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime.   *Id.*  Although Antoine was the shooter, Judge Grimm imposed a total sentence of 270 months (22.5 years).   *Id.*, ECF 465.

On the other hand, some sentences approach the sentence here.   In *United States v. Whisonant, et al.*, ELH-17-191, three of the defendants pleaded guilty to conspiracy to distribute heroin and to discharging a firearm resulting in death, during and in relation to a drug trafficking crime, or to possession of a firearm in furtherance of a drug trafficking crime.   One defendant received a total sentence of 360 months imprisonment, another received a sentence of 420 months, and still another received a sentence of 480 months of incarceration.   *See id.*

To Carter's credit, he has successfully completed numerous BOP programs and courses. ECF 381 at 7-8, 12-16.   And, "[r]emarkably, and to his credit, Carter has never had a single infraction" during his approximately 22 years in custody.   ECF 384-3; ECF 424 at 17; *see* ECF 438-1 at 1-3 (listing education courses and noting his lack of disciplinary infractions).   And, he has endeavored to remain involved with his family.   Several family members wrote to the Court on his behalf, including his children.   ECF 408 at 8-23; ECF 424 at 17; ECF 438-4 at 4-10.

Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see Lancaster*, 2021 WL

1823287, at *3 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 F. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 F. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

Yet, Carter's crimes were extraordinarily serious. At trial and at sentencing, the government maintained that defendant was a leader of a dangerous drug trafficking organization and that he and his codefendants employed violence during the course of the drug conspiracy. ECF 389 at 1. The government claimed that multiple firearms were used during the conspiracy. ECF 389 at 1, 12. Judge Davis found that the defendant was a leader of the drug organization. ECF 400-1 at 19-21. He was satisfied, by clear and convincing evidence, that application of the murder cross-reference was appropriate under § 2D1.1(d)(1) of the Guidelines, although he found that codefendant Bobby Brown, not Carter, was the actual shooter in the murder of Pennix. *Id.* at 9-10.

As mentioned, Carter does not have as significant a criminal history as his codefendant, Bobby Brown. Although the PSR reflected that Carter had a Criminal History of III, Judge Davis determined that he had a Criminal History of I. ECF 424 at 4. This was derived from convictions for a handgun offense and possession with intent to distribute cocaine base. ECF 501 at 22. But,

Carter committed the instant offense while on probation for his prior narcotics conviction. *Id.* at

29. The offense here occurred less than two years after his release from prison for the narcotics

offense. *Id.*

Carter has cited COVID-19 as a basis for compassionate release, but his argument is

founded entirely in generic concerns about COVID-19 conditions while incarcerated. *See* ECF

438 at 25-28. He offers no argument, nor any medical records, as to how COVID- 19 poses a

particular risk to him personally, as opposed to prisoners in general. And, as the government

points out, at 50 years of age, Carter does not fall into a high-risk category on the basis of his age.

ECF 501 at 23; *see also COVID-19 Risks and Vaccine Information for Older Adults*, CTRS. FOR

DISEASE       CONTROL    &    PREVENTION,    https://www.cdc.gov/aging/covid19/covid19-

older-adults.html (last accessed Nov. 10, 2022) ("The risk increases for people in their 50s and

increases in 60s, 70s, and 80s. People 85 and older are the most likely to get very sick.").

However, even without increased risk, Carter's incarceration in the midst of a global

pandemic has "sufficiently increased the severity of the sentence beyond what was originally

anticipated such that the purposes of sentencing are fully met even with the proposed reduction."

*United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also*

*United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting

that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-

19, become "one immeasurably greater than necessary").

Carter also points to his family circumstances as a compelling and extraordinary reason to

reduce his sentence. *See* ECF 438 at 4-5, 31. Specifically, Carter claims that his mother, Nancy

Carter, has no primary care provider and suffers from "high blood pressure, arthritis,

gastroesophageal reflux disorder (GERD), history of Transsystematic attacks, and was recently diagnosed with a heart murmur" and has limited used of her right hand. *Id.* at 4-5. Carter contends that his mother cannot care for herself and that he would be her primary care provider. *Id.*

Carter did not submit Nancy Carter's medical records. But, he provided an affidavit from his mother. ECF 438-2. She states: "I am now an elderly woman and can not take care of myself very well." *Id.* ¶ 2. She does not specify her age. Nor does she indicate whether or not other family members are available to help her.

Relevant here, the commentary to U.S.S.G. § 1B1.13 provides that either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner" may constitute a compelling reason for the defendant's release. U.S.S.G. § 1B1.13 cmt.1(C). But, in the absence of evidence that a prisoner is the sole available caregiver for his or her minor child or incapacitated spouse, district courts typically find that the inmate's family circumstances do not amount to an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A). *See, e.g., United States v. Johnson*, 13-00082 (KSH), 2021 WL 3260847, at *4 (D.N.J. Jul. 29, 2021); *United States v. Tucker*, 3:14-CR-0367-B-84, 2021 WL 977100, at *1 (N.D. Tex. Mar. 15, 2021); *United States v. Tyler*, Crim. No. 09-391, 2021 WL 736467, at *4 (E.D. La. Feb. 25, 2021); *United States v. Bolden*, CR-16-320-RSM, 2020 WL 4286820, at *5 (W.D. Wash. Jul. 27, 2020).

The record does not establish that Carter is the only possible caregiver for his mother. *See Hamilton*, 715 F.3d at 337 (establishing that defendant, as the moving party, bears the burden of establishing that he is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A));

*Edwards*, 451 F. Supp. 3d at 565 (same).  Thus, in my view, Carter has failed to establish an extraordinary and compelling reason for his release on the basis of his family circumstances.  *See United States v. Bailey*, ELH-16-396, 2022 WL 4017293 (D. Md. Sept. 1, 2022).

In light of the very serious nature of Carter's offenses, the substantial reduction in sentence that Carter already received his prior criminal record, his lack of increased risk of severe illness due to COVID-19, and the lack of necessity to act as his mother's caregiver, I am of the view that defendant does not qualify for immediate compassionate release.  However, considering the length of Carter's sentence, his efforts towards rehabilitation while in custody, his lack of any infractions, and the challenges posed by the pandemic, I conclude that a 35-year (420-month) sentence is "greater than necessary" to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact.  The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release.  *See, e.g.*, *Johnson*, 2020 WL 6063733 (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 2020 WL

2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions.  A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction in Carter's sentence, from 35 years to 33 years (396 months), is warranted.  As I see it, a sentence of 33 years' imprisonment is sufficient but not greater than necessary to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).

## V.    Conclusion

For the reasons set forth above, I shall grant the Motion (ECF 438) in part.   In particular, I shall reduce Carter's sentence for Count Eight from 25 years to 23 years, for a total sentence of 33 years (396 months).   I shall adopt all of the previously imposed terms and conditions of supervised release.

An Order follows, consistent with this Memorandum Opinion.


Date:  November 18, 2022                     _____/s/_____

                                             Ellen L.  Hollander
                                             United States District Judge

37